**David L. ADAMS, Petitioner–Appellant,**

v.

**R.S. PETERSON, Superintendent of O.S.C.I., Respondent–Appellee.**

No. 87–4191.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 29, 1989.

Decided July 30, 1991.

Stephen R. Sady, Chief Deputy Federal Public Defender, Portland, Or., for petitioner-appellant.

Rives Kistler, Asst. Atty. Gen., Salem, Or., for respondent-appellee.

Before FERGUSON, BRUNETTI and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

David Adams appeals from the district court's dismissal of his petition for habeas corpus. Adams claims that his Oregon convictions for burglary, rape, and sodomy violated his right to due process of law because a state court judge entered judgment on stipulated facts and failed to advise him on the record of the legal consequences of the stipulation. We now affirm.

I

In November 1981, Adams, who was seventeen-years-old at the time, was indicted in the Lane County Circuit Court on charges of first-degree rape, sodomy, and burglary of a female schoolteacher. Adams agreed to stipulate to certain facts at trial rather than to proceed through the more usual presentations of evidence by both the prosecution and the defense. Adams so agreed on the advice of his attorney, who indicated that Adams's prior juvenile record, along with the nature and circumstances of his crime, might lead to a harsher sentence if he was convicted following an extended trial. In addition, in return for Adams's agreeing to a stipulated-facts trial, the state agreed to dismiss two other indictments then pending against him.

Adams repeatedly told his attorney that he wanted to testify. On three separate occasions, however, his attorney explained to Adams that, if he agreed to a stipulated-facts trial, he could testify only at sentencing.

The written stipulation, which tracked the language of the indictment, provided that "the evidence of the State would establish the following facts beyond a reasonable doubt:" on September 7, 1981, (1) Adams, without consent, legal authority, or other justification, entered and remained in the residence of one Marylee Donley with the intent to commit the crimes of rape, sodomy, and sexual abuse (Count I); (2)

Adams unlawfully and knowingly caused his penis to penetrate Donley's vagina, and at the time of this sexual intercourse, Donley was subjected by Adams to forcible compulsion (Count II); and (3) Adams unlawfully and knowingly caused his penis to contact Donley's anus, and at the time of this deviate sexual intercourse, she was subjected by Adams to forcible compulsion (Count III). Stipulation at 1, *State v. Adams*, No. 10–81–10777 (Or.Cir.Ct., Lane County) (Jan. 18, 1982) [hereinafter "Stipulation"]. The stipulation concluded that "[b]ased on this stipulation, it is the expectation of the parties that the defendant will be found guilty of Count I, Count II, and Count III." *Id.* at 2.

During the stipulated-facts trial, the following colloquy took place between the state trial judge and Adams:

THE COURT: You've discussed your manner of trial with your attorney?

THE DEFENDANT: Yes, I did.

THE COURT: You are freely and voluntarily waiving your right to trial by jury?

THE DEFENDANT: Yes.

THE COURT: Election to waive jury will be entered. . You're consenting to have this matter tried by stipulated facts?

THE DEFENDANT: Yes, your Honor.

MR. HANSEN [DEFENDANT'S ATTORNEY]: Your Honor, we've both reviewed the stipulation and executed it.

THE COURT: Stipulated facts will be filed with the clerk, and I'll read those over. You may be seated.

All right, I would find the Defendant guilty of Count I, Burglary in the First Degree; Count II, Rape in the First Degree, and Count III, Sodomy in the First Degree.

Transcript of Proceedings, *State v. Adams*, No. 10–81–10777 (Jan. 18, 1982) [hereinafter "Trial Transcript"].

Between conviction and sentencing, Adams gave his attorney a written statement of his version of the assault in which he denied committing the crimes of rape and sodomy. However, Adams told his attorney that he did not want his attorney

to withdraw the previously stipulated facts. At the sentencing hearing, the court questioned Adams on the circumstances of the rape. After listening to Adams's testimony, the court imposed the statutory maximum of twenty years of imprisonment for the rape, a consecutive maximum of twenty years for the sodomy, but no additional sentence for the burglary. There was no direct appeal.

Adams subsequently petitioned for post-conviction relief in Oregon state court, contending that his stipulated-facts trial was constitutionally invalid. He argued that he had not voluntarily and intelligently agreed to such a trial. At a hearing on this petition, the following colloquy took place between Adams and his new attorney:

Q Okay did you—did—when did you have discussions with your attorney regarding the stipulated facts trial? When in relationship to when you actually did it?

A Weeks prior to it.

Q Okay what did he tell you that a stipulated facts trial was?

A That I would be waiving my right to a jury and it would be my testimony against the victims. That I would get up and go to a regular trial without the jury.

Q Did you assume that the judge would make the decision?

A Yes. That I would just go in front of the judge.

Q Did you assume that you would have the right to give testimony on your behalf?

A Yes. Yes I did.

. . . .

Q —so during that stipulated facts trial it kind of came to your attention that this isn't a regular trial?

A Yes.

Q Did you say anything to your attorney about it?

A Well my attorney—I kind of looked at him and he gave me a nod and I guess he knew what he was doing.

Q Okay did you talk with him specifically about it while you were doing it?

A No.

Q Did you simply believe that he had things under control?

A Yes.

. . . .

Q Okay were there any of these charges that you didn't believe you were guilty of?

A Yes.

Q What, if any, of those?

A The rape and sodomy.

Transcript of Proceedings at 6, 8, 11–12, *Adams v. Sullivan*, No. 140,109 (Or.Cir. Ct., Marion County) (Nov. 4, 1983) [hereinafter "Post–Conviction Transcript"]. Adams was thereafter cross-examined by respondent's attorney:

Q Had you completed the eleventh grade prior to this criminal proceeding?

A Yes I did.

Q And you got your GED out at OSCI?

A Yes.

Q Can you read?

A Yes I can.

. . . .

Q All right, let's go a piece at a time then. You were placed in a county jail and an attorney was appointed to represent you, correct?

A Yes.

Q At some time later there was a discussion about entering into a stipulated facts trial, correct?

A Yes.

Q And after that you received a document from your attorney which you have in your hand relating to the stipulated facts that were going to be introduced before the judge, didn't you?

A Yes.

Q And you received that in the county jail, right?

A Yes.

Q And he left it with you so you could read it at your leisure, didn't he?

A Uhm, man—well I'm not sure. I can't say exactly if he did or not. He left me a lot of material so I'm not sure whether to answer yes or no because there was a lot of things that he did leave me.

. . . .

Q All right returning again now to the stipulated facts document on the second page above your signature read that last paragraph out loud to the court, would you please.

A Based on this stipulation it is the expectation of the parties that the defendant will be found guilty of count one and two and count three.

Q What does that mean to you?

A That—that I will be found guilty based on this.

Q And you understood that at that time too, didn't you?

A Yes.

*Id.* at 15, 17, 18.

After the state post-conviction hearing, a state court made the following factual findings: (1) at the stipulated-facts trial Adams understood the written stipulation and that judgment would be based solely upon it; (2) at the stipulated-facts trial Adams understood that he was waiving all of his statutory and constitutional trial rights; and (3) Adams voluntarily agreed to a trial based on the stipulated facts and voluntarily executed the stipulation. The court therefore denied Adams's petition for post-conviction relief. This ruling was affirmed without opinion by the Oregon Court of Appeals; the Oregon Supreme Court denied review.

Adams then filed the current habeas corpus petition, which the district court dismissed. We have jurisdiction over Adams's timely appeal under 28 U.S.C. § 1291.

## II

### A

■ Adams argues that his stipulation of facts at trial constituted a de facto guilty plea and that he was therefore entitled to the procedural protections attendant to the entering of such a plea. Specifically, he claims that he was entitled to be advised by the judge in open court of his constitutional rights (a) against compulsory self-in-

crimination, (b) to be tried by a jury, and (c) to confront his accusers, and that the court had a constitutional obligation to establish on the record that he voluntarily and intelligently waived these rights. *See Boykin v. Alabama,* 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969); *Quiroz v. Wawrzaszek,* 749 F.2d 1375, 1377 (9th Cir. 1984), *cert. denied,* 471 U.S. 1055, 105 S.Ct. 2119, 85 L.Ed.2d 483 (1985).[1] While we agree that a stipulated-facts proceeding is subject to certain constitutional restrictions, *see infra* Part III, we are not persuaded that the stipulation at issue was a de facto guilty plea.

Adams and the state agreed "that the evidence of the State would establish the [facts in question] beyond a reasonable doubt." Stipulation at 1. Following the recitation of facts, the stipulation stated, "Based on this stipulation, it is the expectation of the parties that the defendant will be found guilty of Count I, Count II, and Count III." *Id.* at 1371.

■ Adams never stipulated that he was guilty of the crimes of burglary, rape, and sodomy; in fact, Adams pled not guilty to all three counts on which he was convicted by the trial court. Adams only stipulated that the enumerated facts were supported beyond a reasonable doubt by the *evidence* that the state possessed and would present at trial. A stipulation to facts from which a judge or jury may *infer* guilt is simply not the same as a stipulation *to* guilt, or a guilty plea. "A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment." *Boykin,* 395 U.S. at 242, 89 S.Ct. at 1711–12. If the *Boykin* Court itself recognized this distinction,

then we are hardly in a position to ignore it—or to hold, as our dissenting colleague would, that the full *Boykin* protections extend to the circumstance of a stipulation. *See post* at 1381–1383.[2]

We have previously ruled in analogous circumstances that a defendant in Adams's position is not entitled to the full protections that attend the entry of a guilty plea. In *United States v. Terrack,* 515 F.2d 558 (9th Cir.1975), we considered whether Rule 11 of the Federal Rules of Criminal Procedure, which imposes certain procedural requirements upon a federal court's acceptance of a plea of guilty or nolo contendere, also applies to its acceptance of a stipulation of facts for a criminal trial. *See* Fed. R.Crim.P. 11. We determined that Rule 11 does not apply to stipulations and emphasized that to read Rule 11 otherwise

> would unduly encumber trials now often shortened by stipulation of evidence and [stipulations] to identify exhibits, to specify the chain of custody, and other important matters. To require a Rule 11 examination on every stipulation containing a vital admission of the defendant would add ritualistic formalities where none are needed nor required.... If Rule 11 were to be applied only to stipulations constituting de facto pleas of guilty, when and how is that determination to be made? Every stipulation of a vital fact is an admission *tending* to establish guilt. Rule 11 specifically applies to pleas of guilty and *nolo contendere* and not to trials. These are areas with a clear division between them. They are either black or white. To create a gray area where stipulations, as a part of a trial, would be governed by the rules on the acceptance of pleas would further

1. Adams apparently concedes and the record indisputably reveals that he did voluntarily and intelligently waive his second *"Boykin* right," the constitutional right to a jury trial, after being questioned by the trial judge in open court. The pertinent issue on appeal, therefore, is whether the trial court committed reversible error in failing to procure voluntary and intelligent waivers of the other two *"Boykin* rights."

2. Nor do the parties' *expectations* change the analysis. With all due respect to the dissent, an expectation that the trier of fact will find that

the facts as stipulated demonstrate the defendant's guilt does not render the stipulation a de facto guilty plea. When presented with a stipulation of fact, an Oregon trial court is under no statutorily or judicially imposed obligation to find the defendant guilty. *See Lyons v. Pearce,* 298 Or. 569, 571–73, 694 P.2d 978, 980 (1985). The stipulation is only a method for introducing the evidence, and the parties' expectations are only their views on what the trial's outcome will be.

complicate the trial judge's duties and push him further into the role of an advocate.

*Terrack*, 515 F.2d at 561 n. 3 (emphasis added); *see also United States v. Schuster*, 734 F.2d 424, 425 (9th Cir.1984) (per curiam) (holding that a plea of not guilty combined with a stipulation of facts that strongly suggests guilt does not constitute a de facto guilty plea and therefore does not implicate the procedural protections of such a plea), *cert. denied*, 469 U.S. 1189, 105 S.Ct. 959, 83 L.Ed.2d 965 (1985); *United States v. Miller*, 588 F.2d 1256, 1263–64 (9th Cir.1978) (same), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979); *United States v. Nixon*, 545 F.2d 1190, 1191 (9th Cir.1976) (same), *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1148, 51 L.Ed.2d 565 (1977); *United States v. Garcia*, 450 F.2d 287, 288 (9th Cir.1971) (per curiam) (same); *accord Lyons v. Pearce*, 298 Or. 569, 694 P.2d 978 (1985) (same, as a matter of Oregon law).

We recognize that *Terrack* differs from the case before us in two significant respects. First, Adams was convicted in state court, not in federal court; Rule 11, therefore, does not apply here. *See Roddy v. Black*, 516 F.2d 1380, 1383 (6th Cir.), *cert. denied*, 423 U.S. 917, 96 S.Ct. 226, 46 L.Ed.2d 147 (1975). Second, Adams has challenged the procedural aspects of his convictions on constitutional grounds, not on statutory or rule-based grounds.

**3.** Indeed, if it has any significance at all, the federal-state distinction seems to weigh against appellant's position. *Terrack* involved the direct appeal of a federal conviction; the present case, on the other hand, involves the collateral review of state convictions—which have already been collaterally reviewed and thereafter validated by the state judicial system. In a similar context, another court has explained:

> The standard of review in a collateral attack upon a guilty plea [under 28 U.S.C. § 2255] is entirely different from that on a direct appeal. In collateral proceedings the courts have held that a conviction will be vacated for a Rule 11 violation only if it amounts to "a fundamental defect which inherently results in a complete miscarriage of justice (citations omitted)." *Carreon v. United States*, 578 F.2d 176, 179 (7th Cir.1978).... On direct appeal, the rule generally applied is that "any noncompliance with Rule 11 is reversible error." *McCarthy v.*

Nonetheless, we conclude that the rationale of *Terrack* is equally applicable in the current context and, indeed, is persuasive. The fact that Adams was convicted in a state proceeding rather than a federal proceeding is of no moment; he has brought a federal constitutional challenge, and the level of procedural protection mandated by the federal Constitution for the entry of a stipulation or plea to be valid is certainly no greater in a state forum than it is in a federal forum. *See Henderson v. Morgan*, 426 U.S. 637, 653, 96 S.Ct. 2253, 2261–62, 49 L.Ed.2d 108 (1976) (Rehnquist, J., dissenting on other grounds).[3]

Similarly, we can conceive of no reason why the Constitution might require the trial court to construe Adams's stipulation as a de facto guilty plea if Rule 11, in an analogous circumstance, would not. *See* Fed.R.Crim.P. 11 advisory committee's note on 1974 amendments (explaining that Rule 11(c), as amended, codifies the requirements of *Boykin*); *United States v. McWilliams*, 730 F.2d 1218, 1223 (9th Cir. 1984) (same). After all, Rule 11 grants federal defendants broader protections than the Constitution. *See Haase*, 800 F.2d at 127 (constitutional rights that attend entry of a guilty plea have "more limited scope" than rights conferred by Rule 11); *see also United States v. Sherman*, 474 F.2d 303, 307 (9th Cir.1973) (Hufstedler, J., dissenting on other grounds) ("When compliance with Rule 11 is not in issue because

*United States*, 394 U.S. 459, 464 n. 9, 89 S.Ct. 1166, 1170 n. 9, 22 L.Ed.2d 418 (1969).... *United States v. Fels*, 599 F.2d 142, 149 n. 5 (7th Cir.1979) (per curiam); *see also Haase v. United States*, 800 F.2d 123, 127 (7th Cir.1986) (collateral Rule 11 challenges under section 2255 are reviewed under a more deferential standard than direct Rule 11 challenges).

If a more deferential standard applies to the collateral review of a federal guilty plea than applies to the direct review of that same plea, then certainly an even more deferential standard must apply when, as here, the court collaterally reviews a *state* guilty plea. Comity, respect for the state's own procedural rules, and respect for the state's sovereign interest in the administration of its own criminal justice system pose an additional reason for deference that is wholly absent from the purely federal context.

the plea is taken in state court ... the validity of the plea rests on compliance with the less rigorous demands of due process."). Indeed, if the Constitution mandated broader protections than Rule 11, the *Terrack* decision would make little sense even in the federal realm: what Rule 11 requires would be largely irrelevant—and hardly worthy of analysis—if the dictates of due process required more.

Finally, Adams himself has suggested that we should consider Rule 11 jurisprudence to be a relevant framework for our analysis, noting that the constitutional rights of which he claims to have been unlawfully deprived "are codified in the procedures guaranteed by Rule 11" and appear in substantially identical form in the procedural rules of the Oregon Revised Statutes.

In short, we hold that Adams was not entitled to the full constitutional protections that apply to the tendering of a guilty plea.

### B

In determining that the parties' stipulation did not constitute a guilty plea, we consider the purposes of the defendant and his counsel in choosing this method of presenting evidence to the trier of fact. The affidavit of Adams's trial counsel, submitted during the Oregon post-conviction proceeding and refiled as an exhibit to the state's motion for summary judgment below, explained the defense's thinking as follows:

> The evidence against Mr. Adamas [sic] was fairly overwhelming. It included bite marks on the victim's body that were matched by plaster molds and experts from California to Mr. Adams'[s] own teeth. These bites were in places that were incosistent [sic] with Mr. Adams'[s] description of how things occurred.
>
> \* \* \* \* \* \*
>
> Mr. Adams did express to me repeatedly that his preference and desire would be to take the stand and make his own statement to the judge. It was the State's position that if there was going to

be any testimony by the defendant, they would want to have a complete full trial. If there was going to be a trial, then there was no need for them to dismiss the other charges that were currently pending against Mr. Adams, charges that they would insist on pursuing and requesting the maximum [penalty for]. His prior juvenile record made it seem imminently [sic] reasonable that consecutive sentences might well be in order.

> \* \* \* \* \* \*
>
> I had the stipulation put in writing specifically to avoid a lengthy and inflammatory recitation of the facts by the District Attorney. Mr. Adams signed the stipulation in open court.

Affidavit of R. Chris Hansen at 2, 3–4, *Adams*, No. 140, 109 (Sept. 1, 1983) [hereinafter "Affidavit"].

In the defense's own understanding, therefore, Adams clearly did not plead guilty; he professed his innocence and pursued a trial strategy designed to avert what his attorney perceived to be potentially more damaging and perhaps prejudicial: a full-scale recitation of the evidence before the judge or jury. Perhaps wisely, the defense viewed the stipulation as (a) the most effective and least inflammatory method for presenting the facts to the trial court and (b) the most effective means of foreclosing any effort by the state to prosecute Adams to the full extent of the law. Indeed, Adams himself has admitted that a prime motivation for his agreeing to the stipulation was to have two indictments pending against him dropped. Under such circumstances—where the defense itself does not intend its actions to be construed as an admission of guilt and where it has strategic reasons to support its decision to stipulate—it would be curious indeed for the trial court to hold that the parties' stipulation does constitute a plea of guilty.

### C

The dissent suggests that *Quiroz v. Wawrzaszek*, 749 F.2d 1375 (9th Cir.1984), *cert. denied*, 471 U.S. 1055, 105 S.Ct. 2119, 85 L.Ed.2d 483 (1985), controls this case. We do not agree. In *Quiroz*, we were

confronted with a petition for habeas corpus filed by an Arizona state prisoner who had, pursuant to an agreement with the prosecution, "submitted [his] case to the state trial court for decision on the police reports." *Id.* at 1377. We determined that "the due process protections for the waiver of constitutional rights apply equally to the submission procedure used [t]here as they would to the entry of a plea of guilty." *Id.*

In *Quiroz,* however, the state's attorney *conceded* at oral argument "that the submission process [wa]s tantamount to a plea of guilty and require[d] the federal constitutional protections attendant to a plea of guilty." *Id.* That concession forced us to address *Quiroz* as a guilty-plea case; the lack of a similar concession here allows us to analyze Adams's stipulation for what it truly is: a method for introducing evidence and no more.

### III

Having determined that the stipulation was not a de facto guilty plea and that Adams was therefore not entitled to the full measure of protection that attends such a plea, we must now determine what due process protections *are* required for the present stipulation and convictions to be valid. The answer here is clear and mandated by our prior decisions: Adams's convictions are valid only if he voluntarily and intelligently agreed to the stipulation. *See United States v. Ferreira–Alameda,* 815 F.2d 1251, 1253 (9th Cir.1986); *Schuster,* 734 F.2d at 426; *Miller,* 588 F.2d at 1264; *Garcia,* 450 F.2d at 288. Reviewing de novo the district court's denial of Adams's petition for habeas relief, *see Weygandt v. Ducharme,* 774 F.2d 1491, 1492 (9th Cir.1985), we address first the voluntariness and then the intelligence of Adams's plea.

### A

Adams claims that his agreement to a stipulated-facts trial was involuntary. The state court that heard Adams's post-conviction petition found otherwise:

3. Petitioner voluntarily agreed to a trial based on stipulated facts and voluntarily executed the stipulation setting forth the facts on which he was tried.

Findings of Fact, Conclusions of Law and Judgment at 2, *Adams v. Sullivan,* No. 140,109 (Jan. 1, 1984) [hereinafter "Findings"]. We presume the factual elements in the state court's findings to be correct if amply supported by the record. *See* 28 U.S.C. § 2254(d) (1988); *Sumner v. Mata,* 449 U.S. 539, 543–52, 101 S.Ct. 764, 767–72, 66 L.Ed.2d 722 (1981).

Here the record does support the state court's finding, and we therefore reject Adams's argument that his agreement to a stipulated-facts trial was involuntary. Adams was faced with an admittedly difficult choice. He could proceed to an extended trial on the merits, replete with witnesses and potentially damning evidence, or he could agree to a stipulated-facts trial and receive a dismissal of two other indictments pending against him. As his attorney indicated, he chose to proceed to trial by stipulated facts because, after consultation with his attorney, he determined that the benefits outweighed the costs. Indeed, the defense decided to have the facts "put in writing specifically to avoid a lengthy and inflammatory recitation of the facts." Affidavit at 3–4. Furthermore, Adams indicated to the trial judge that his attorney had discussed the manner of trial with him:

THE COURT: You've discussed your manner of trial with your attorney?

THE DEFENDANT: Yes, I did.

THE COURT: You are freely and voluntarily waiving your right to trial by jury?

THE DEFENDANT: Yes.

THE COURT: Election to waive jury will be entered. You're consenting to have this matter tried by stipulated facts?

THE DEFENDANT: Yes, your Honor.

Trial Transcript at 2. The record indicates that, rather than being coerced, Adams weighed the costs and benefits of the stipulated-facts trial procedure and made a rational decision to pursue that route.

In short, we reject Adams's argument that his actions at trial were involuntary and accept the Oregon state court's deter-

mination that he "voluntarily agreed to a trial based on stipulated facts and voluntarily executed the stipulation setting forth the facts on which he was tried."

### B

■ Adams next argues that he did not act intelligently in agreeing to a stipulated-facts trial. This question, too, an Oregon state court addressed and answered following a hearing on Adams's state petition for post-conviction relief:

1. At the time of petitioner's trial on stipulated facts, petitioner understood the facts set forth in the written stipulation presented to the court; petitioner understood that the court would determine petitioner's guilt or innocence solely on the basis of such stipulated facts; and petitioner understood that it was expected that the court would find petitioner guilty on the basis of such stipulated facts.

2. At the time of petitioner's trial on stipulated facts, petitioner understood that by proceeding in such manner he would be giving up all of his statutory and constitutional trial rights, including, but not limited to, the right to testify and to confront and cross-examine witnesses produced against him.

Findings at 2. Here again, the record amply supports the state court's conclusion that Adams's action was a "knowing, intelligent act[ ] done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1468–69, 25 L.Ed.2d 747 (1970). Indeed, Adams testified at his post-conviction hearing that he was aware at trial of the consequences of the stipulation:

Q   All right returning again now to the stipulated facts document on the second page above your signature read that last paragraph out loud to the court, would you please.

A   Based on this stipulation it is the expectation of the parties that the defendant will be found guilty of count one and two and count three.

Q   What does that mean to you?

A   That—that I will be found guilty based on this.

Q   *And you understood that at that time too, didn't you?*

A   *Yes.*

Post–Conviction Transcript at 18 (emphasis added). Adams's trial attorney also submitted evidence to the state court which rejected Adams's post-conviction argument that his plea had not been voluntary or intelligent. His affidavit reads in part as follows:

After reviewing the files, I do recall fairly clearly the circumstances surrounding the stipulated facts trial. The evidence against Mr. Adamas [sic] was fairly overwhelming. It included bite marks on the victim's body that were matched by plaster molds and experts from California to Mr. Adams'[s] own teeth. These bites were in places that were incosistent [sic] with Mr. Adams'[s] description of how things occurred. Mr. Adams did present me with a written statement as to his version of the assault on Ms. Donley.... This statement was presented, incidentally, after the stipulated facts trial took place and prior to sentencing. I asked Mr. Adams at that time whether he wanted to attempt to withdraw the stipulated facts trial when I received this written statement, and he said he did not want to do that.

Prior to the trial date, I had discussed with Mr. Adams, on at least two separate occasions, the effect and impact of the stipulated facts trial. I did so because Mr. Adams, while fairly intelligent, was unsophisticated in the more arcane aspects of the criminal law, including the meanings of a stipulated facts trial. Mr. Adams did express to me repeatedly that his preference and desire would be to take the stand and make his own statement to the judge.... I explained to him on at least two separate occasions and then again on the morning that we actually went before Judge Beckett with the stipulation, that any statement he would make to the Court would have to be at sentencing and would not be at the stipulated facts trial. *I tried to do this*

*in as non-technical a fashion as possi-
ble, and I clearly recall that Mr. Adams
understood what I was telling him and
that, albeit reluctantly, he would agree.*

*On January 18, 1982, we went before
Judge Beckett with the stipulation. The
stipulation was in writing, and Mr.
Adams had a chance to read it in advance
and I explained the words to him. I had
the stipulation put in writing specifically
to avoid a lengthy and inflammatory reci-
tation of the facts by the District Attor-
ney. Mr. Adams signed the stipulation
in open court.*

Affidavit at 2–4 (emphasis added). This
further supports the state court's conclu-
sion that Adams acted intelligently in
agreeing to a stipulated-facts trial.

In short, given Adams's own testimony
at his post-conviction hearing and the other
evidence in the record, we hold that Adams
has failed to overcome the presumption of
correctness accorded to the state court's
finding that he understood the nature and
consequences of his agreement to a stipu-
lated-facts trial. We therefore reject his
claim that he acted unknowingly.

## IV

It would be inappropriate to conclude
this opinion without responding to two con-
tentions raised in the dissent. First, the
dissent argues that Adams was a minor at
the time of his trial in state court and that,
under Oregon law, his case therefore
should have been heard by a juvenile court.
The dissent notes that the record before us
discloses no hearing on whether Adams
should be tried in an adult court. The
dissent concludes from this fact both that
there was no such hearing and that we
must determine whether, in the seeming
absence of such a hearing, the trial court
properly had jurisdiction over Adams. Yet
the dissent itself concedes, as it must, that
Adams "has not raised the jurisdictional
question" here. *Post* at 1387. In fact,
insofar as we are aware, the question was
never raised anywhere. Contrary to the
dissent's argument, we are aware of no

authority for the proposition that it is in-
cumbent upon this appellate court *sua
sponte* to raise, address, and resolve this
fundamental state law question.[4]

The dissent also seems to contend at
length that in sentencing Adams the state
trial court treated him unfairly because
Adams is a black man and the victim a
white woman. We fail to perceive the rele-
vance of the later-imposed sentence to the
question of whether Adams had acted vol-
untarily and intelligently when he agreed
to and underwent a stipulated-facts trial.
We also note that the trial court addressed
specifically the severity of the sentence it
imposed on Adams. It rejected the conten-
tion by Adams's attorney that the state
was counseling a harsh sentence because
of the races of the criminal and the victim:

Well, I've been in the business of crimi-
nal justice, if you want to call it that,
for—since 1967 or '68. I've prosecuted
murders, manslaughters, negligent homi-
cides. I've prosecuted people that have
beat babies, killed them, starved babies
to death, beat up kids, knifed each other,
shot each other, killed people with cres-
cent wrenches. I've sat in this court-
room and watched rapes and assaults.

You are, sir, one of the most danger-
ous persons I think I've ever read a
report about. I think what it points out
is you're in there doing a burglary and
the woman hits you because she catches
you in the act. She rolls over in bed and
there you are on the floor.

Now, for a person who is not danger-
ous, and is a property crime criminal,
escape would come first to the fore.
Maybe an assault upon the victim to get
out of the house, any violence necessary
to leave.

But angry rape and sodomy, mad sexu-
al attack, tells me that there is some-
thing seriously wrong with you. No-
body, nobody who is anywhere near aver-
age commits a sex act when they are
mad and angry. That shows to me that
you are very much a dangerous person.

---

**4.** Unlike the dissent, we express no opinion as to
whether Adams himself, if he so elects, may in

the future raise the jurisdictional argument in
Oregon or federal court.

And I don't care, I guess, at this point how young or old you are. I've seen so many 17–, 18–, 16–year–old kids now that that shock is starting to wear off.

*I don't care what sex you are. I don't care what race you are. I don't care what race the victim is.*

*But I see you as a real danger, especially when you're angry, and it appears to me you're an angry person.*

Transcript of Proceedings on Appeal at 18–19, *State v. Adams*, No. 10–81–10777 (Mar. 24, 1982) (emphasis added); *see also id.* at 17 (Adams's testimony that when the victim "hit me with some kind of ceramic piece, my anger just—I sort of just—my anger took over"). We think that the trial court's comments on this point adequately explain the court's conduct and provide in themselves a sufficient response to the dissent.

### V

Adams, a relatively educated young man, wanted the benefits of a stipulated-facts trial: a hoped-for lighter sentence, the dismissal of two other indictments pending against him, and the avoidance of a drawn-out presentation of the facts. He also wanted the benefits of a more elaborate trial, including the opportunity to testify in his own behalf. Faced with a mutually exclusive choice between these two options, he chose a stipulated-facts trial. Because his choice was voluntary and intelligent, we must affirm the district court's dismissal of his petition for a writ of habeas corpus.

AFFIRMED.

FERGUSON, Circuit Judge, dissenting:

As a 17–year–old, David Llewellyn Adams at the time of his arrest and throughout the state court proceedings was subject to the exclusive jurisdiction of juvenile court. Yet, according to the record before this court, he was incarcerated in an adult jail and tried in adult court without any hearing to justify adult court jurisdiction. Once in adult court, Adams signed a de facto guilty plea, presented to him as a "stipulation of facts." That plea was accepted by the Oregon court without any of the admonitions required by *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). The Oregon judge, fully aware of the boy's age, then imposed a maximum sentence of 40 years in prison, 20 years without possibility of parole. Every reviewing court, including the majority of this panel, has upheld this travesty, ignoring the exclusive jurisdiction of the juvenile court and mischaracterizing the guilty plea as a "stipulation of facts." I dissent.

### I. *The State Court Proceedings*

Mr. Adams' state trial attorney, in simple but stark words, summed up his observations about Mr. Adams and his state court proceedings this way:

My strong personal feeling was that this young man was hammered harder than the people I have represented in similar situations, basically because he was black and the victim was a white school teacher. I made the mistake of expressing those sentiments in so many words at Mr. Adams' sentencing. I'm still feeling the repercussions from that hearing.

Adams was charged in state court with first degree burglary, rape and sodomy. At all times the defendant contended that while he was guilty of burglary, he did not commit rape or sodomy.

Adams' state court attorney attempted to negotiate a settlement of the case with the prosecution. The attorney was concerned that the 17–year–old defendant was a black male and the stated victim was a white female school teacher. The defendant, however, repeatedly informed his attorney that he wanted to take the stand and make his own statement to the judge. The defendant had an extensive juvenile court and detention record and was still of juvenile age. Juvenile court proceedings in Oregon are conducted solely by a judge and there is no right to a jury trial. Not once in these proceedings was the defendant ever informed by anyone that he would be subject to the jurisdiction of an adult court; that adult court functions differently than juvenile court; and that in an adult court a fundamental right is a jury trial. There

are references galore by state judges and the majority here that the defendant waived his right to a trial by jury. However, there is nothing indicating that this was an informed waiver given this young man's inexperience with adult court proceedings.

David Adams' attorney told him that in order to get any concessions from the state regarding the charges, Adams would have to proceed by a stipulated facts trial and any statement he wanted to make had to be at the time of sentencing.

The night before the trial, a proposed written stipulation was left with the defendant to read. The defendant signed the stipulation in open court. The stipulation, which tracks the words of the charges identically, reads as follows:

> COMES NOW the parties in the above case, the defendant in person and by and through his attorney, Robert C. Hansen, and the State of Oregon by and through Joseph Martin Kosydar, Assistant District Attorney for Lane County, and enter into the following stipulation.
>
> That the evidence of the State would establish the following facts beyond a reasonable doubt:
>
> (1) That the events described in this stipulation occurred on September 7, 1981 in Lane County, Oregon;
>
> (2) With respect to Count I of the indictment charging Burglary in the First Degree, the defendant, without consent, legal authority, or other justification, entered and remained in the residence of Marylee Donley located at 725 East 44th Street, Eugene, Oregon, and, further, that at the time of the entering and remaining, the defendant had the intent to commit the crimes of rape, sodomy, and sexual abuse;
>
> (3) With respect to Count II of the indictment charging Rape in the First Degree, the defendant at the time described in number (1) above, did unlawfully and knowingly cause his penis to penetrate the vagina of Marylee Donley, a female, and at the time of his sexual intercourse, Marylee Donley was subject-

ed to forcible compulsion by the defendant;

> (4) With respect to Count II of the indictment charging Sodomy in the First Degree, the defendant at the time described in number (1) above, did unlawfully and knowingly cause his penis to contact the anus of Marylee Donley, a female, and at the time of this deviate sexual intercourse, Marylee Donley was subjected to forcible compulsion by the defendant.
>
> Based on this stipulation, it is the expectation of the parties that the defendant will be found guilty of Count I, Count II, and Count III.

After signing the stipulation, the defendant signed a consent to waive a jury.

It must be repeated and emphasized that the stipulation contains the following language: *"Based on the stipulation, it is the expectation of the parties that the defendant will be found guilty of Count I, Count II, and Count III."* (Emphasis added). Strangely, despite this statement, the majority still denies that the stipulation was for all purposes a de facto plea of guilty. However, this statement is what distinguishes this case from all other stipulated-fact cases previously considered by this court.

The following consists of the entire proceedings pursuant to which the stipulation was accepted by the court and the defendant found guilty:

*MONDAY, JANUARY 16, 1982*

THE COURT: David Llewellyn Adams.

MR. HANSEN: Your Honor, this is the time we would like, pursuant to negotiations, to do a stipulated trial on indictment 10–81–10777. My client has agreed to waive a jury in that matter and we're prepared to execute a jury waiver at this time.

The negotiations—this is done pursuant to negotiations and the State has agreed to dismiss at the time of sentencing on this matter—two indictments that are pending have been filed, and I believe

the Court has both of those files, 10–81–10741 and 10–81–11234. Those will be dismissed at sentencing and those are the negotiations.

MR. KOSYDAR: That's correct your Honor. It's a written stipulation; it's our expectation that the Defendant will be found guilty of the three crimes set forth in the indictment.

THE COURT: All right, if you'll execute the waiver of the jury trial.

MR. HANSEN: Your Honor, we have both executed the consent to waive jury.

MR. KOSYDAR: I've tendered a copy of the written stipulation to the Court.

THE COURT: This is your signature that appears on the election to waive jury?

THE DEFENDANT: Yes, your Honor.

THE COURT: You've discussed your manner of trial with your attorney?

THE DEFENDANT: Yes, I did.

THE COURT: You are freely and voluntarily waiving your right to trial by jury?

THE DEFENDANT: Yes.

THE COURT: Election to waive jury will be entered. You're consenting to have this matter tried by stipulated fact?

THE DEFENDANT: Yes, your Honor.

MR. HANSEN: Your Honor, we've both reviewed the stipulation and executed it.

THE COURT: Stipulated facts will be filed with the clerk and I'll read those over. You may be seated.

All right, I would find the Defendant guilty of Count I, Burglary in the First Degree; Count II, Rape in the First Degree, and Count III, Sodomy in the First Degree.

Now, presentence report will be ordered and upon receipt this will be set for sentencing. Anything further for the State?

MR. KOSYDAR: No.

The relevant parts of the sentencing procedures and the state post-conviction hearing which pertain to issues before us are set forth adequately in the majority opinion. I have added a copy of David Adams' own account of the events at issue as an appendix to this dissent. Adams wrote this account after the stipulated facts trial but before sentencing, and gave it to his attorney. The statement was never introduced before the sentencing court, however. Despite his explicit desire to do so, Adams was never able to present before the sentencing judge his own version of what transpired.

## II. *The De Facto Guilty Plea*

The facts here disclose that Adams' stipulation was a de facto guilty plea and, therefore, he was entitled to those due process protections which attach to submission of a guilty plea under *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). The majority denies that Adams' stipulation constitutes a de facto guilty plea. Therefore, the majority contends that Adams' stipulation is valid as long as he agreed to it voluntarily and intelligently. In reaching this conclusion, the majority rewrites the law of this circuit to achieve the result which it desires.

In this case, the Oregon courts and the federal district court held that due process protections did not apply because Adams' plea was a mere "stipulation of facts." The majority accepts their conclusions, relying on this court's opinion in *United States v. Terrack*, 515 F.2d 558 (9th Cir. 1975). However, as the majority concedes, "[a] stipulation to facts from which a judge or jury may *infer* guilt is simply not the same as a stipulation *to* guilt, or a guilty plea." That statement precisely explains why this case is distinguishable from *Terrack*, and the other cases the majority cites in support of its holding.[1]

---

1. Even the defendant in *Terrack* was provided more protections than were given to Adams by the state court. The trial court in *Terrack* informed the defendant, "By signing the stipulation agreeing to [the government's evidence] you are virtually stipulating to the facts which indicate your guilt. Do you understand that?" *Id.* at 560 n. 2. The court then went on and said, "for all intents and purposes this is a guilty plea ... [a]nd with that knowledge you are then waiving those rights ...?" *Id.* Adams was nev-

The most recent stipulated facts case which the majority can cite to is *United States v. Schuster,* 734 F.2d 424, 425 (9th Cir.1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 959, 83 L.Ed.2d 965 (1985). But *Schuster* is readily distinguishable from this case. In *Schuster,* this court affirmed a conviction and held that the court was not required to advise the defendant of his constitutional right to confrontation. However, the court pointed out that (1) Schuster did not stipulate to facts conclusively demonstrating his guilt, in order to pursue his right to raise an affirmative defense on appeal; (2) the stipulation did not eliminate the ultimate obligation of the government to prove the elements of the crime; (3) the defendant presented a vigorous attack on the sufficiency of evidence at trial; (4) the stipulation was conditioned upon Schuster's right to appeal; and (5) the facts set forth in the stipulation were historical facts.

None of these elements is present in this case. As the majority concedes, the stipulated "facts" were the allegations of the indictment. That neither Rule 11 nor due process protections applied in *Schuster* has no bearing on a case clearly controlled by *Boykin.* As the majority notes, Adams challenges the constitutional deficiency of the state court's acceptance of his de facto guilty plea, while Terrack's appeal alleged a Rule 11 violation. Although this fact clearly distinguishes this case from *Terrack,* the majority simply chooses to ignore this difference. Yet, it must be clear that a challenge based on a federal constitutional violation demands a much more strenuous review by this court than one based on a statutory violation.

The majority supports its conclusion that the stipulation was not a guilty plea by looking to the intent of Adams and his attorney. However, the majority then ignores Adams' intent and focuses on the trial strategy of his attorney. The conclusion reached is that "[i]n the defense's own

er given this much information about the document he signed.

**2.** While the record in this case indicates that the defendant waived a jury trial, there is nothing showing that the court determined it to be an informed waiver. Again, this circuit requires

understanding, therefore Adams clearly did not plead guilty...." *supra* at 1375. However, this statement is contradicted by Adams' attorney's affidavit, quoted by the majority. "Mr. Adams did express to me repeatedly that his preference and desire would be to take the stand and make his own statement to the judge." *supra* at 1375 (quoting affidavit of R. Chris Hansen). The majority can not cite a single case to support the proposition that a court reviewing the validity or existence of a guilty plea may rely on the defense counsel's understanding of the proceedings despite the defendant's own obvious lack of understanding.

Given the stipulation's obvious intent to parallel a guilty plea, I can not accept the majority's conclusion that Adams simply agreed to a factual stipulation and, thus, *Boykin* protections do not apply.

### III. *The Validity of the Guilty Plea*

Before accepting what was essentially Adams' guilty plea, the trial judge merely asked Adams four stock questions: (1) This is your signature?; (2) You've discussed your manner of trial with your attorney?; (3) You are freely and voluntarily waiving your right to trial by jury?; (4) You're consenting to have this matter tried by stipulated facts? Under the law of this circuit, considerably more is required: the trial judge must personally inform the defendant, on the record, not only of his right to a jury trial, but also of the right against self-incrimination, the right to confront his accusers, and must ascertain that the defendant understands the consequences of waiving those rights, including the maximum penalty he may receive. *Quiroz v. Wawrzaszek,* 749 F.2d 1375, 1377–78 (9th Cir.1984), *cert. denied,* 471 U.S. 1055, 105 S.Ct. 2119, 85 L.Ed.2d 483 (1985). One may search the record forever but will find no knowing waiver of these rights.[2]

more. Specifically, we have demanded that the trial court determine that a defendant's waiver of a constitutional right be "made voluntarily, knowingly and intelligently." *United States v. Cochran,* 770 F.2d 850, 851 (9th Cir.1985).

In *Quiroz*, this court held that when the defendant stipulates to all the facts supporting his or her guilt, the protections set forth in *Boykin* apply. *Quiroz* was decided nine years after *Terrack*, and in the same year as *Schuster*. The case reflects this court's evolving treatment of cases where the parties stipulate to the defendant's guilt. In *Quiroz* we held:

> Without regard to the status of a submission as a matter of law, we agree that the due process protections for the waiver of constitutional rights apply equally to the submission procedure used here as they would to the entry of a plea of guilty.
>
> At a minimum, the trial judge must inform the defendant, on the record, of his privilege against compulsory self incrimination, his right to a jury trial and his right to confront his accusers, and the consequences of waiving those rights. *Boykin v. Alabama*, 395 U.S. 238, 243-44, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969).

749 F.2d at 1377. The submission process used by the Oregon state court in Adams' trial presents an even more compelling argument for the application of *Boykin*. While the defendant in *Quiroz* submitted his case based on police reports, Adams' stipulation precisely mirrored the statutory charges against him.

*Quiroz* then elaborated further on the requirement that the judge inform the defendant on the record of the "consequences" to the defendant of waiving the privilege against self-incrimination, the right to jury trial, and the right to confront his accusers. We stated that among the consequences which must be explained is the maximum penalty which could result from the waiver, and described the requirement that this explanation appear on the record as a "prophylactic rule." *Id.* at 1378. Subsequent courts have cited to *Quiroz* for this holding. *See, e.g., United States v. Williams*, 782 F.2d 1462, 1466 (9th Cir.1985) (citing *Quiroz* for proposition

that "due process requires defendant know maximum penalty"); *Worthen v. Meachum*, 842 F.2d 1179, 1182 (10th Cir.1988) (citing *Quiroz* for proposition that "[a] plea is not voluntary unless the defendant knows the direct consequences of his decision, including the maximum penalty to which he will be exposed.").[3]

For the rule that due process requires the trial court to address the defendant on the record about his understanding of his basic rights and the consequences of their waiver, *Quiroz* cited not only to *Boykin*, but also to two earlier Ninth Circuit cases, *United States ex rel. Pebworth v. Conte*, 489 F.2d 266 (9th Cir.1974), and *Yellowwolf v. Morris*, 536 F.2d 813 (9th Cir.1976). In *Pebworth*, a guilty plea was entered without the trial court's informing the defendant of the potential maximum sentence. *Pebworth*, 489 F.2d at 267-268. Since the trial record did not show an adequate colloquy between the court and the defendant, "[t]his court remanded for an evidentiary hearing to determine whether he had been in fact aware of the possible sentence and ruled that if the answer was negative, the plea and the conviction should be vacated, giving the state the choice of retrying or releasing him." *Yellowwolf*, 536 F.2d at 815. In *Yellowwolf*, we wrote:

> We note in particular how *Pebworth* combines with the Supreme Court's opinion a few years earlier in *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), which established the requirement that the record affirmatively disclose that a defendant who pleaded guilty did so understandingly and voluntarily. It is not enough that the defendant was sufficiently aware, under *Boykin*: the trial court is obligated to establish that awareness for the record.

*Id.* at 816 n. 5.

In federal court, Federal Rule of Criminal Procedure 11 sets out the inquiries a district judge must make before accepting a guilty plea. Rule 11 requires, in part:

---

**3.** The majority attempts to distinguish *Quiroz* by stating that in that case the state attorney conceded the submission was a de facto guilty plea. However, the *Quiroz* opinion does not indicate

that its conclusion rests on the state's concession. The majority must rely on such a thin reed because no other distinguishing factors can be found.

Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform him of, and determine that he understands, the following:

. . . .

... the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law. . . .

. . . .

... the right to be tried by a jury and at that trial the right to the assistance of counsel, the right to confront and cross-examine adverse witnesses, and the right against compelled self-incrimination. . . .

Fed.R.Crim.P. 11. This court has recognized that "[t]he provisions of Rule 11 ... were adopted by the Supreme Court as the measure of the validity of a guilty plea in *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), and *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)." *United States v. McWilliams*, 730 F.2d 1218, 1223 (9th Cir.1984). *Boykin* quoted extensively from *McCarthy*, and required that a state trial record disclose the affirmative waiver of constitutional rights for the same reasons as applied to federal courts in *McCarthy*. *Boykin*, 395 U.S. at 243 n. 5, 89 S.Ct. at 1712 n. 5.

Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. First, is the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment and applicable to the States by reason of the Fourteenth. Second, is the right to trial by jury. Third, is the right to confront one's accusers. We cannot presume a waiver of these three important federal rights from a silent record.

What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence. When the judge dis-

charges that function, he leaves a record adequate for any review that may be later sought, and forestalls the spin-off of collateral proceedings that seek to probe murky memories.

*Id.* at 243–44, 89 S.Ct. at 1712–13 (citations and footnotes omitted). Employing the same term—"prophylactic"—later adopted by our circuit in *Quiroz*, Mr. Justice Harlan commented that "what is now in effect being held is that the prophylactic procedures of Criminal Rule 11 are substantially applicable to the States as a matter of federal constitutional due process." *Id.* at 247, 89 S.Ct. at 1714 (Harlan, J., dissenting).

Many states, including the state of Oregon, revised their state rules of criminal procedure after *Boykin* to require Rule 11 admonitions before accepting a plea of guilty or its equivalent. Closely following the language of Rule 11, Or.Rev.Stat. § 135.385 (1989) reads:

(1) The court shall not accept a plea of guilty or no contest to a felony or other charge on which the defendant appears in person without first addressing the defendant personally and determining that the defendant understands the nature of the charge.

(2) The court shall inform the defendant:

a) That by a plea of guilty or no contest the defendant waives the right:

(A) To a trial by jury;

(B) Of confrontation; and

(C) Against self-incrimination.

b) Of the maximum possible sentence on the charge, including the maximum possible sentence from consecutive sentences.

Or.Rev.Stat. § 135.385.

The Supreme Court of Oregon, in *Stelts v. State of Oregon*, 299 Or. 252, 701 P.2d 1047 (Or.1985), has explained unequivocally that this state text is a "statement of Due Process Clause law developed by the Supreme Court of the United States," 701 P.2d at 1050, designed to "ensure that a defendant's waiver of constitutional rights would be valid and supply the basis for a constitutionally valid plea of guilty." *Id.*

This court has recognized that habeas relief is available when the defendant was not adequately informed of his rights and the full consequences of his plea. *Carter v. McCarthy*, 806 F.2d 1373, 1375 (9th Cir. 1986), *cert. denied*, 484 U.S. 870, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987). "Determining the voluntariness of a plea involves a review of all the relevant circumstances surrounding it." *Id.* (citing *Brady v. United States*, 397 U.S. 742, 749, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970)). Here, Adams was clearly not advised of any of the federal rights which he waived by signing the stipulated facts agreement, nor was he informed by the judge, on the record, of the "direct consequences," *id.* (quotation omitted), of his de facto guilty plea. In such a situation, the appropriate course for this court is to determine from the record whether, despite the state court's error, Adams was "fully aware" of the rights he was waiving and the consequences of his plea. *Id.* at 1376 (quoting *Brady*, 397 U.S. at 755, 90 S.Ct. at 1472) (internal quotation marks omitted).

Granted, "*Boykin* does not require the state court to enumerate *all* of the rights a defendant waives so long as the record indicates that the plea was entered voluntarily and knowingly." *Rodriguez v. Ricketts*, 798 F.2d 1250, 1254 (9th Cir.1986), *cert. denied*, 479 U.S. 1057, 107 S.Ct. 937, 93 L.Ed.2d 987 (1987). However, this states nothing contrary to *Quiroz*. A plea of guilty involves a waiver of considerably more rights and consequences than those enumerated in *Quiroz*. Neither *Quiroz*, *Boykin*, nor *McCarthy* requires that a court, before accepting a plea of guilty, "inform a defendant of his right to a speedy and public trial, his right to an impartial jury, his right to compulsory process for obtaining witnesses, his right to be free from cruel and unusual punishment, his right to be free from unreasonable searches and seizures, his right to have excluded from the trial any evidence illegally seized, and many more." *Holloway v. Lynaugh*, 838 F.2d 792, 794 (5th Cir.), *cert. denied*, 488 U.S. 838, 109 S.Ct. 104, 102 L.Ed.2d 80 (1988). *See also Pebworth*, 489 F.2d at 267 n. 1. Nor does due process

require that a defendant be informed of all collateral consequences of his plea. *Carter*, 806 F.2d at 1375. This circuit, like the state of Oregon, rather has held that voluntary and understanding waiver of the three constitutional rights enumerated in *Boykin* and an understanding of the direct consequences of that waiver (including the maximum penalty) are a constitutional minimum.

We have already noted that the Supreme Court of Oregon, specifically following *Boykin*, has upheld the rule in *Quiroz*. *Stelts*, 299 Or. 252, 701 P.2d 1047 (1985). A number of other states have done the same. As three Justices noted in *Johnson v. Ohio*, 419 U.S. 924, 95 S.Ct. 200, 42 L.Ed.2d 158 (1974) (dissenting from denial of certiorari),

> The accused can waive only a *known* right and the State has the burden of demonstrating a known waiver. To repeat what we said in *Boykin*, "[w]e cannot presume a waiver ... from a silent record." *Boykin* established that the State must demonstrate the defendant's knowing waiver of the three constitutional rights there enumerated. Two states have so interpreted *Boykin* as a constitutional minimum. *People v. Jaworski*, 387 Mich. 21, 194 N.W.2d 868 (1972); *In re Tahl*, 1 Cal.3d 122, 460 P.2d 449 (1969)....
>
> The *Boykin* enumeration was illustrative, not exhaustive.... Ohio seems to recognize the need to accommodate constitutional rights other than the three mentioned in *Boykin*, since its own Supreme Court has held that a trial judge must advise the defendant of his right to be proved guilty beyond a reasonable doubt before accepting a guilty plea. *State v. Griffey*, 35 Ohio St.2d 101, 298 N.E.2d 603 (1973).

*Id.* 419 U.S. at 925–26, 95 S.Ct. at 200 (citation omitted).

Other federal circuit courts have also read *McCarthy* and *Boykin* this way. The Fifth Circuit has acknowledged a requirement that state defendants be "Boykinized" by trial court judges. *Walker v. Maggio*, 738 F.2d 714, 716 (5th Cir.1984),

*cert. denied,* 469 U.S. 1112, 105 S.Ct. 793, 83 L.Ed.2d 786 (1985). The Fifth Circuit has properly explained the test for whether *Boykin* is satisfied:

> In *Boykin v. Alabama* the Supreme Court held that a guilty plea to a criminal charge is "more than admission of conduct; it is a conviction." Such a plea waives several federal constitutional rights, among them the privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one's accusers. *To establish that a guilty plea was intelligently and knowingly entered the record must affirmatively reflect that the accused was informed of and waived these rights.*

*Long v. McCotter,* 792 F.2d 1338, 1345 (5th Cir.1986) (emphasis added) (footnotes omitted).

The Fifth Circuit's application of *Boykin* highlights the fact that the majority has failed even to apply the proper legal standard for evaluating the validity of Adams' plea. According to the majority, "the convictions are valid only if Adams voluntarily and intelligently agreed [to the plea]." *Supra* at 1376. But as noted by the Fifth Circuit, the terms "voluntary and intelligent" have a specific content under *Boykin:* comprehension of the waiver of specific constitutional rights. Nowhere in the majority's supposed showing of an intelligent waiver is there any reference to articulation of the specific *Boykin* rights or the constitutionally relevant consequences (particularly the maximum penalty). Such a showing exists neither in the trial record nor anywhere else, including the defense attorney's own discussions with Adams. As a result, Adams' conviction must be vacated.

> We have held that "the dictates of Rule 11 and the federal policy of fair and efficient judicial administration require that the reviewing court look solely to the record of the plea proceeding." ... [The defendant] is entitled to plead anew.

*United States v. Jaramillo–Suarez,* 857 F.2d 1368, 1372–73 (9th Cir.1988).

The majority wrongly focuses on Adams' alleged "choice" between alternative courses of action, applying the standard of *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Yet the *Alford* standard does not address whether the *Boykin* requirements were fulfilled: the Supreme Court itself explicitly stated that *Alford* raised "no issues of substance under *Boykin....*" *Id.* at 29 n. 3, 91 S.Ct. at 163 n. 3.

The Second Circuit as well has noted that *McCarthy* and *Boykin* were companion cases whose requirements for valid pleas derived both from the procedures codified in Rule 11 and from due process. *United States v. Rossillo,* 853 F.2d 1062 (2d Cir. 1988). In *Rossillo,* the Second Circuit cited from *Boykin* to explain the constitutional underpinnings of Rule 11, *id.* at 1066, and noted that *McCarthy*'s Rule 11 burden on trial court judges also invoked constitutional due process. *Id.* at 1067. In *Oppel v. Meachum,* 851 F.2d 34, 37 (2d Cir.), *cert. denied,* 488 U.S. 911, 109 S.Ct. 266, 102 L.Ed.2d 254 (1988), the Second Circuit, citing *Boykin,* stated simply, "It is constitutional error *for a trial judge to accept* a defendant's guilty plea 'without an affirmative showing that it was intelligent and voluntary.'" *Id.* (emphasis added). The Second Circuit's view underscores the prophylactic nature of the *Boykin* requirements: it is the trial judge's responsibility to ascertain on the record the validity of the plea at the time it is accepted. When, as here, no inquiry was made on the record, the defendant must be allowed to replead.

Even if I were to accept the majority's conclusion that Adams' de facto guilty plea was voluntarily, Adams would still be entitled to relief from this court. The majority's conclusion is based on its presumption that the state court's findings on voluntariness are correct. However, there are no factual findings supporting the state court's ultimate determination of voluntariness in the record, nor was there any evidentiary hearing on the question. The majority ignores this circuit's rule that "[d]eference is not accorded to a state court's determinations of mixed questions of law and fact or of purely legal questions...." *Torrey v. Estelle,* 842 F.2d 234, 235 (9th

Cir.1988). *See also Oppel,* 851 F.2d at 38 (where there has been no evidentiary hearing, state court's determination is "not entitled to deference under § 2254(d)"). "The voluntariness of a guilty plea is a question of law not subject to deferential review." *Iaea v. Sunn,* 800 F.2d 861, 864 (9th Cir. 1986) (citations omitted). When the trial transcript reveals the failure of the trial court to inform the defendant of his *Boykin* rights, the burden is on the state to show a valid plea, and that burden is a heavy one.

> Where the record from the trial court is inadequate to affirmatively demonstrate that the plea was intelligent and voluntary, the state may not utilize a presumption to satisfy its burden of persuasion. And, where it seeks to satisfy that burden by supplementing an incomplete contemporaneous record with extrinsic evidence, that evidence must be clear and convincing.

*Dunn v. Simmons,* 877 F.2d 1275, 1277 (6th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1539, 108 L.Ed.2d 778 (1990). *See also United States ex rel. Grundset v. Franzen,* 675 F.2d 870, 878 (7th Cir.1982).

Failure to "Boykinize" at the time of acceptance of the plea would minimally require remand for an evidentiary hearing in which the state carried the burden of showing a valid plea. *Blalock v. Lockhart,* 898 F.2d 1367, 1370–71 (8th Cir.1990); *Pitts v. United States,* 763 F.2d 197, 200 (6th Cir. 1985). No such hearing was ever had in this case. Even were we to accept the majority's erroneous conclusion that Adams only agreed to a stipulation, Adams would be entitled to a remand for a hearing on the question of voluntariness.

### IV. *The Trial Court's Lack of Jurisdiction.*

David Adams was 17 throughout the course of the state court proceedings. Adams was thus a juvenile, under the exclusive original jurisdiction of juvenile court. Or.Rev.Stat. §§ 419.476, 419.533(2), 419.478; *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). Yet it was an adult court—the Lane County Circuit Court—which charged Adams and issued the judgment against him. Adult courts lack subject matter jurisdiction over offenses committed by juveniles unless the jurisdiction of the juvenile court has been waived in a due process hearing. *In re Gault,* 387 U.S. 1, 30–31, 87 S.Ct. 1428, 1445–46, 18 L.Ed.2d 527 (1967); *State v. Scurlock,* 286 Or. 277, 593 P.2d 1159 (1979); *Delaney v. State,* 58 Or.App. 442, 648 P.2d 1302 (1982); *Brady v. Gladden,* 232 Or. 165, 374 P.2d 452 (1962). The record in this case discloses no such hearing. The Oregon court which sentenced Adams was therefore without jurisdiction, and its judgment is void. *Johnson v. Zerbst,* 304 U.S. 458, 468, 58 S.Ct. 1019, 1024–25, 82 L.Ed. 1461 (1938) ("The judgment of conviction pronounced by a court without jurisdiction is void, and one imprisoned thereunder may obtain release by *habeas corpus.*").

Although Adams himself has not raised the jurisdictional question, this court has authority "to look behind and beyond the record of his conviction to a sufficient extent to test the jurisdiction of the state court to proceed to a judgment against him …" *Id.* at 466, 58 S.Ct. at 1023–24 (citation omitted). For

> not every state procedural default bars federal habeas corpus relief. Title 28 U.S.C. §§ 2254(b), (c), which require a state prisoner to exhaust available state remedies, are limited in their application to those state remedies still open to the habeas applicant at the time he files his application in federal court.

*Humphrey v. Cady,* 405 U.S. 504, 516, 92 S.Ct. 1048, 1055, 31 L.Ed.2d 394 (1972) (citing *Fay v. Noia,* 372 U.S. 391, 434–435, 83 S.Ct. 822, 846–847, 9 L.Ed.2d 837 (1963)). *See also Engle v. Isaac,* 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 1570 n. 28, 71 L.Ed.2d 783 (1982). In Adams' case, because Adams failed to raise the jurisdictional question in his original petition for post-conviction relief, he was barred by Oregon law from raising the claim in state court at the time he filed his petition for habeas corpus. Or.Rev.Stat. 138.550(3) (1989); *Dotta v. Maass,* 91 Or.App. 222, 754 P.2d 36, *rev. denied,* 306 Or. 413, 761 P.2d 531

(1988); *Page v. Cupp*, 78 Or.App. 520, 717 P.2d 1183, *rev. denied*, 301 Or. 338, 722 P.2d 737 (1986). He had therefore exhausted his state remedies for purposes of 28 USC § 2254. *Fay*, 372 U.S. at 435, 83 S.Ct. at 847; *see also, e.g., Keener v. Ridenour*, 594 F.2d 581, 584 (6th Cir.1979).

Moreover, the rule of exhaustion is not jurisdictional, but rather "a rule ordering the state and federal proceedings so as to eliminate unnecessary federal-state friction." *Fay*, 372 U.S. at 435, 83 S.Ct. at 847 (1963); *Wainwright v. Sykes*, 433 U.S. 72, 80, 97 S.Ct. 2497, 2502–03, 53 L.Ed.2d 594 (1977) (rules of comity do not undermine federal power to entertain habeas petitions); 28 U.S.C. § 2254(d)(4) (denying deference to state court findings when state court lacked jurisdiction). If a lower court's "want of power appears on the face of the record of his condemnation, whether in the indictment or elsewhere, the court which has authority to issue the writ [of habeas corpus] is bound to release him." *Ex parte Nielsen*, 131 U.S. 176, 183, 9 S.Ct. 672, 674, 33 L.Ed. 118 (1889) (citation omitted).

Although generally failure to raise a constitutional claim in state court results in waiver of the claim under the "cause and prejudice" doctrine, *Wainwright*, 433 U.S. at 72, 97 S.Ct. at 2497, because the judgment of a court lacking jurisdiction is simply a nullity, the defense of absence of subject matter jurisdiction cannot be waived. *See, e.g., Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.1983). The writ of habeas corpus was first restricted in American jurisprudence to cases where "the judgment under which the prisoner is detained is shown to be absolutely void for want of jurisdiction in the court that pronounced it...." *Frank v. Mangum*, 237 U.S. 309, 327, 35 S.Ct. 582, 587, 59 L.Ed. 969 (1915); *see also, e.g., Wainwright*, 433 U.S. at 78 (citing *Ex parte Kearney*, 7 Wheat. 38, 20 U.S. 38, 5 L.Ed. 391 (1822)). While the extent to which application of the writ to various constitutional rights should be constrained by deference to state judgments and procedures has undergone considerable evolution, *Wainwright, supra*, the bedrock principle

of habeas corpus that an individual imprisoned as a result of a jurisdictionally void judgment "is entitled to his immediate release" has never been questioned. *Fay*, 372 U.S. at 402, 83 S.Ct. at 829.

Adams is now over the age of 21, and the Juvenile Court can no longer exercise jurisdiction. However, if there was in fact no appropriate waiver of the Juvenile Court's jurisdiction, Adams' conviction must be vacated. *Kent*, 383 U.S. at 565, 86 S.Ct. at 1059 (1966). *See also Powell v. Hocker*, 453 F.2d 652, 657 (9th Cir.1971), *overruled on other grounds, Harris v. Procunier*, 498 F.2d 576 (9th Cir.) (en banc), *cert. denied*, 419 U.S. 970, 95 S.Ct. 235, 42 L.Ed.2d 186 (1974).

## V. *Rape, Race, and Due Process*

Constitutional protections, especially the right to confrontation, are not always easy to defend, particularly when we must defend the right of a man to confront a woman who says she has been raped. Rape is far too serious a crime, too often unprosecuted, too often disbelieved, to allow anyone much comfort in enforcing procedures which can make conviction of rapists more difficult. *See* Weiner, *Shifting the Communication Burden: A Meaningful Consent Standard in Rape*, 6 Harv. Women's L.J. 143 (1983).

Sadly, women's statements that they have been raped are frequently dismissed unless the woman is a white woman accusing a black man. Estrich, *Rape*, 95 Yale L.J. 1087 (1986). This fact does not justify taking a charge of rape any less seriously simply because it is a white woman who does the accusing and a black man who is the accused. *See* Bumiller, *Rape as a Legal Symbol: An Essay on Sexual Violence and Racism*, 42 U.Miami L.Rev. 75, 86–88 (1987). There are young black men who do commit rape and who must be prosecuted severely, just as there are white women who falsely accuse young black men. It is precisely in morally complex cases like the one before us that due process is most important.

No matter how vigorously we seek to stop rape, we must acknowledge that prosecution of rape in this country remains tainted by racial prejudice. During the years that rape could be penalized by death, executions for rape were virtually "reserved for black men who raped white women. Between 1930 and 1967, 89% of the men executed for rape in this country were black. That figure includes 36% of the black men who were convicted of raping a white woman; only 2% of the defendants convicted of rape involving any other racial combination were executed." Estrich, *Rape*, 95 Yale L.J. 1087, 1089 n. 2. *See also*, Mann & Selva, *The Sexualization of Racism: The Black as Rapist and White Justice*, 3 J. Black Studies 168 (1979). American jurors continue to be more likely to believe that a black man accused of rape is guilty than to presume his innocence. H. Field & L. Bienen, Jurors and Rape 47 (1980); Johnson, *Black Innocence and the White Jury*, 83 Mich.L. Rev. 1611 (1985). And judges are especially severe when ruling on black men accused or convicted of rape. The national pattern is to impose the maximum penalty on black men found guilty of raping white women. Wriggins, *Rape, Racism, and the Law*, 6 Harv.Women's L.J. 103 (1983); LaFree, *The Effect of Sexual Stratification by Race on Official Reactions to Rape*, 45 Am.Soc.Rev. 842 (1980).

Equally troubling as the continued presence of these prejudices in our system is the vehemence with which the prejudice is denied, which only makes more difficult a fair hearing for black men accused of raping white women. The following colloquy from David Adams' sentencing hearing reflects this problem.

MR. HANSEN [Public Defender]: I can only—well, I guess there's another thing about this case that bothers me, Your Honor. And it's something that I've been seeing recently, and I may be out of line. But I was before this court on Monday with Mr. Tracy Jackson, also a young black man. And PSI (Presentence Investigation Report) was prepared in that case. And the Court's aware of the many, I think serious inaccuracies that were contained in that presentence re-

port. The recommendation in that was, given the crime, potentially pretty serious.

And again, I have the same sort of situation here. When I started getting some inaccuracies in Mr. Jackson's report, I started checking into this one, and got again some, what I think, are pretty serious inaccuracies. And again my client's a young black man.

I guess my feeling is that, and I've represented other clients in this kind of a situation, dealing possibly even with more serious matters, the abuse of young children, and I don't see recommendations, I don't see the district attorney coming in and making this kind of a presentation and a recommendation, and I have not seen presentence investigations making this kind of a recommendation, with these kinds of inaccuracies, what I see as serious inaccuracies underlying their recommendation.

And I—I know Mr. Atkinson, and I—he's not here to defend himself or respond to this. And I guess to a degree I don't feel very comfortable about it.

But I think the appearance, anyway, it certainly is the appearance in my own client's eyes, that his race and color may have something to do with the recommendation that the Court's hearing from the state.

MR. KOSYDAR: It's got nothing to do with it at all. I resent those remarks. I'd recommend the same thing if he were Chinese, if he were Mexican, or if he were white.

Ask that those remarks be stricken as no foundation for them in fact. If there is, I challenge Mr. Hansen to prove it.

MR. HANSEN: Well, the basis for my comments are already there on the record.

MR. KOSYDAR: Prove it.

MR. HANSEN: The recommendations—the basis for my remarks are already there on the record. And I point to the PSI's in the most recent two sentencings in the cases that I talked about.

THE COURT: Are you saying I'm racist, too?

MR. HANSEN: No, I'm not saying that at all, Your Honor. I'm just—I'm talk-

ing about only the recommendations that are contained in the presentence report and the remarks and the position the state has taken.

Unlike the majority, I am unable to find any consolation in this sort of disclaimer that race was not a factor in David Adams' "trial" and sentencing. Whether justice has been disserved must be judged by whether the objective constitutional standards required by law have been applied, not by the subjective statements of individuals.

If, for a moment, we cease to presume that the defendant's agreement to the stipulation proves his guilt, and accept, *arguendo*, that he may not have understood the meaning of his stipulation, David Adams' story is compellingly coherent. Adams, a black teenager, was accused of raping a white woman, a schoolteacher. He had never before gone to trial. His attorney told him that because he had burglarized before, because he admitted burglary and a physical struggle with the woman now accusing him of rape, and because he was black and his accuser was white, an Oregon jury would probably find him guilty and call for a stiff sentence. The attorney's advice is reminiscent of the dynamic of racism in capital sentencing which Justice Brennan lamented in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987):

At some point in this case, Warren McCleskey doubtless asked his lawyer whether a jury was likely to sentence him to die. A candid reply to this question would have been disturbing. First, counsel would have to tell McCleskey that few of the details of the crime or of McCleskey's past criminal conduct were more important than the fact that his victim was white. Furthermore, counsel would feel bound to tell McCleskey that defendants charged with killing white victims in Georgia are 4.3 times as likely to be sentenced to death as defendants charged with killing blacks ... Finally, the assessment would not be complete without the information that cases involving black defendants and white victims are more likely to result in a death sentence than cases featuring any other racial combination of defendant and victim. . . .

The Court today ... finds no fault in a system in which lawyers must tell their clients that race casts a large shadow on the capital sentencing process.

*Id.* at 321–22, 107 S.Ct. at 1782–83 (Brennan, J., dissenting).

Afraid of a jury, the defense attorney sought a deal with the prosecutor. The prosecutor demanded a "stipulation" in which there would be no triable issue of fact or law; defense could take that or face the jury. Adams' attorney agreed to the State's terms, and recommended to Adams a "stipulated facts trial." Adams still wanted to tell his story before the judge. His attorney told him that he would be able to testify at one phase of the proceedings (sentencing), but not the other (trial). His attorney told him that part of the stipulation was an "expectation" that he would be found guilty on some, but not all of the charges brought against him, and that the stipulation was not a guilty plea. He would still get a "trial"—a "stipulated facts trial."

It is at least plausible that a young black man who had not graduated high school could be confused and pressured by this situation into accepting something he did not genuinely understand. It is plausible that, despite the formal language of the stipulation or the consultation with the attorney, the youth believed that agreement to the stipulation—whatever it said—was what he had to do to be able to tell his story before the judge and receive justice.

Perhaps the deepest irony of this story is that the agreement to the "stipulated facts trial" was born of a black teenager's fear, shared by his attorney, that he could not get a fair hearing on these charges before a jury. Adams therefore placed his trust in the court, hoping that there he would find judgment less infected by passion or prejudice. Instead he received a summary conviction without due process and the maximum sentence allowable. It is a harsh fact that many judges are hardly immune from racial prejudice in sentencing decisions. Gibson, *Race as a Determinant of Criminal Sentences: A Methodological Critique and a Case Study*, 12 Law &

Soc.Rev. 455 (1978); Nagel & Neef, *Racial Disparities That Supposedly Do Not Exist: Some Pitfalls in Analysis of Court Records*, 52 Notre Dame Law. 87 (1976).

The majority's assertion that Adams was "a relatively educated young man [who] wanted the benefits of a stipulated-facts trial" does not fit this record. There is extensive testimony by David Adams that he believed he would be able to testify before the judge and assert his innocence on the rape and sodomy charges. There is testimony by Adams' father that the father had also understood, from talking to Adams, that the "stipulated facts trial" would be some sort of "trial" in which there would be an opportunity to contest the charges. There is the simple fact that the stipulation includes admission to crimes which Adams denies committing, and which Adams stated he wanted to contest.

The issue before this court is not an independent view of David Adams. Rather, as expressed by Mr. Justice Holmes, "what we have to deal with is not the petitioner['s] innocence or guilt but solely the question whether [his] constitutional rights have been preserved." *Moore v. Dempsey*, 261 U.S. 86, 87–88, 43 S.Ct. 265, 265–66, 67 L.Ed. 543 (1923). That legal question is not a close one in this case: clearly the trial judge failed to ascertain on the record that the defendant affirmatively understood the meaning of his stipulation. Due process, under our Constitution, must apply equally to all the people, including young black men accused of rape. *See, e.g., Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

I dissent.

*APPENDIX: Statement of David Adams to his Attorney (not introduced before the sentencing court)*

This is my statement about what happen, 9/7/81.

On the night of September 7, 1981. I entered the house of Marylee Donley with intent to commit Burglary in the first degree. I entered the side door of the victims dwelling. I was looking for money or other valuable items. I check the fridge. Then I went up stairs and checked a bed-room which was empty, and a studylike room which was empty to. I then returned to the first floor of the dwelling, and went down a hall. I heared a mumbleing noise so I went to my knees and began to crawl. I suspected some kind of pants or wallet or purse to the side of the bed in which a person slept. The room was in total darknest and couldn't make the exact sex of the person sleeping on the bed reason why I wanted to was so I didn't get caught and get my head beat in by the person. I crawled closer to the bed and made out a stand of some kind. I was then startled by a female voice she said "Hey]" I glanced up and before I could run out the room she the female hit in the nose with some kind of ceramic piece I then titled my head down in pain. She jumped down on my back and started hitting me in the head and on the back. I then forced my way up to my feet and reach back to throw her off my back when she clamped down on my index finger on my left hand with her teeth. I went to my knees in pain. She tried drag me forward for reasons unknown. I then twisted my body so it was to the side of her my finger was still in her mouth. She was still trying to go forward for some reason. I then stoped her from the behind and grab her by the face and told her to release my finger but she just bit down harder. I then began to push down with the hand in her mouth and pulled up with my right hand (pulled down and up on her mouth) I told her that I would hit her if she didn't let go of my finger. I did not nor did I want to hit her or any other women. So I bit her in the back as hard as I could. She then released my fingers and I ran out of their and went home and went straight to bed. I was then woke up by my dad. He (my dad) said that the police wanted to talk to me. I got out of bed and they ask me if I wanted to go down to the station and answer a few questions. I said wasn't going to answer any question but I would go down to the sation. The officer in the truk in which I rode down in the officer formed me of my rights. When I got down to the station they started asking about a burglary. I

said want a lawyer and that untill then I am not going to say they still kept asking question. Then a guy in a white jacket came in and said he was going to take pictures of me, and comb my pubic hairs. I ask him what does this have to do with burglary and he said it has something to do with a charge that being put together right now. Another officer came in and said for me to take of my close so the guy in the white jacket can get his edvidence. I then took off my close and they took picturs of my private spot. Took finger nail clippings and salivia. I then reach for my close and the officer which came in to observe this hit my hand back and said don't ever reach for my gun. I told him I was just reaching for my clothes. He said that keeping the clothes. They then took me to skipworth. They came back later took me to a dentist to get teeth impresson from me.

This is my written statement of what happen and it is the truth and nothing but the truth so help me god]